# EXHIBIT 1

## AFFIDAVIT OF SARAH E. MADSEN IN SUPPORT OF PLAINTIFF'S MOTION TO REMAND OR ABSTAIN

*Minnesota Life Insurance Company, et al.*
*v.*
*Credit Suisse First Boston Mortgage Securities Corp., et al.*

**Court File No. 12-cv-02671 (ADM/LIB)**

```
<DOCUMENT>
<TYPE>424B5
<SEQUENCE>1
<FILENAME>e25144_424b5.txt
<DESCRIPTION>FORM 424B5
<TEXT>
```



Prospectus Supplement (To Prospectus Dated August 28, 2006)
CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.
Depositor

DLJ MORTGAGE CAPITAL, INC.
Sponsor and Seller

WELLS FARGO BANK, N.A.
Master Servicer

CSAB MORTGAGE-BACKED TRUST 2006-2
Issuing Entity

CSAB MORTGAGE-BACKED PASS-THROUGH CERTIFICATES, SERIES 2006-2
$1,002,951,100
(Approximate)

```
<TABLE>
<CAPTION>
--------------------------------------------------------
<S>                                                <C>
```

You should carefully review the information  in          The trust will issue:
"Risk Factors" on page S-14 in this prospectus
supplement and on page 5 in the prospectus.          o   Thirteen classes of senior certificates,including one class of residual
                                                         certificates.
This prospectus  supplement may be used to offer and  o   Seven classes of subordinate certificates, hich  provide credit
sell the certificates only if accompanied by the         enhancement for the senior certificates and each class of subordinate
prospectus.                                              certificates, if any, with a higher payment priority.
                                                     o   Two other classes of non-offered certificates.

```
--------------------------------------------------------
</TABLE>
```

The certificates:

o    Represent ownership interests in a trust, whose assets are primarily a
     pool of fixed-rate, first lien residential mortgage loans that were
     generally originated in accordance with underwriting guidelines that are
     not as strict as Fannie Mae and Freddie Mac guidelines.

o    Represent obligations of the trust only and do not represent an interest
     in or obligation of the depositor, the servicers, any special servicer,
     the master servicer, the trust administrator, the sponsor, the seller, the
     trustee or any of their affiliates or any other entity. Except for the
     financial guaranty insurance policy issued by Financial Security Assurance
     Inc. for the benefit of the Class A-3-A and Class A-4 Certificates, no
     governmental agency or instrumentality or any other person will insure the
     certificates or the mortgage loans.

o    Offered to the public and their class principal balances and interest
     rates are listed under the heading "Offered Certificates" in the table on
     page S-6.

Risks:

o    The yield to investors on each class of certificates will be sensitive to
     the rate and timing of principal payments on the mortgage loans which may
     vary over time.

o    Net interest shortfalls from prepayments on mortgage loans and losses from
     liquidations of defaulted mortgage loans will adversely affect the yield
     to investors in the certificates, and the investors in the subordinate
     certificates in particular.

     Principal and interest on the certificates entitled to receive such
amounts will be payable monthly, beginning on the distribution date in October
2006, as described in this prospectus supplement. Credit enhancement for all of
the classes of offered certificates will be provided by overcollateralization,
the use of excess interest to create or maintain overcollateralization and
subordination. The Class A-3-A and Class A-4 Certificates will have the benefit
of a financial guaranty insurance policy issued by Financial Security Assurance
Inc.

     Credit Suisse Securities (USA) LLC, as underwriter, will buy the offered
certificates from Credit Suisse First Boston Mortgage Securities Corp., the
depositor, at a price equal to approximately 99.81% of their face value plus
accrued interest. The depositor will pay the expenses related to the issuance of
the certificates from these proceeds. The underwriter will sell the offered
certificates it purchases from time to time in negotiated transactions at
varying prices determined at the time of sale.

     The trust will make multiple REMIC elections for federal income tax
purposes.

     Neither the SEC nor any state securities commission has approved or
disapproved these securities or determined if this prospectus supplement or the
prospectus is accurate or complete. Any representation to the contrary is a
criminal offense.

Delivery of the offered certificates, other than the Class AR Certificates, will be made in book-entry form through the facilities of The Depository Trust Company, Clearstream, Luxembourg and the Euroclear System on or after September 29, 2006.

Credit Suisse
September 28, 2006

<PAGE>

TABLE OF CONTENTS

<TABLE>
<CAPTION>

|  | Page |
|---|---|
| <S> | <C> |
| SUMMARY | S-5 |
| SUMMARY INFORMATION | S-6 |
| Mortgage-Backed Pass-Through Certificates, Series 2006-2 | S-6 |
| RISK FACTORS | S-14 |
| Risk of Loss | S-14 |
| Limited Obligations | S-15 |
| Special Yield and Prepayment  Considerations | S-15 |
| Recent Events | S-17 |
| Recent Developments Affecting SPS | S-17 |
| FORWARD-LOOKING STATEMENTS | S-19 |
| INTRODUCTION | S-20 |
| DESCRIPTION OF THE MORTGAGE POOL | S-20 |
| General | S-20 |
| Additional Information | S-28 |
| THE ORIGINATORS | S-28 |
| General | S-28 |
| DLJ Mortgage Capital, Inc. | S-29 |
| Credit Suisse Financial Corporation | S-30 |
| STATIC POOL INFORMATION | S-30 |
| AFFILIATES AND RELATED TRANSACTIONS | S-30 |
| THE SPONSOR AND THE SELLER | S-31 |
| THE DEPOSITOR | S-31 |
| THE COUNTERPARTY UNDER THE INTEREST RATE CAP AGREEMENTS | S-31 |
| SERVICING OF THE MORTGAGE LOANS | S-32 |
| General | S-32 |
| Flow of Funds | S-34 |
| Advances from the Servicers, the Master Servicer and the Trustee | S-35 |
| Appointment of Special Servicer; Specially Serviced Loans | S-36 |
| THE MASTER SERVICER AND TRUST ADMINISTRATOR | S-36 |
| THE SERVICERS | S-37 |
| Select Portfolio Servicing, Inc | S-37 |
| Wells Fargo Bank, N.A. | S-42 |
| FEES AND EXPENSES OF THE ISSUING ENTITY | S-44 |
| Adjustment to Servicing Fee in Connection with Prepaid Mortgage Loans | S-46 |
| DESCRIPTION OF THE CERTIFICATES | S-48 |
| General | S-48 |
| Senior Certificates | S-48 |
| Subordinate Certificates | S-48 |
| Designations | S-49 |
| Assets of the Trust | S-49 |
| Book-Entry Registration | S-50 |
| Definitive Certificates | S-51 |
| Distributions | S-51 |
| Glossary of Terms | S-51 |
| Distributions of Interest | S-59 |
| Distributions of Principal | S-60 |
| Credit Enhancement | S-62 |
| The Interest Rate Cap Agreements | S-65 |
| Determination of LIBOR | S-66 |
| POOLING AND SERVICING AGREEMENT | S-67 |
| Assignment of Mortgage Loans | S-67 |
| Representations and Warranties Regarding the Mortgage Loans | S-68 |

</TABLE>

S-2

<PAGE>

<TABLE>
| <S> | <C> |
|---|---|
| Optional Termination; Auction Sale | S-69 |
| The Issuing Entity | S-70 |
| The Trustee | S-70 |
| The Trust Administrator | S-72 |
| Voting Rights | S-73 |
| Restrictions on Transfer of the Residual Certificates | S-73 |
| Final Scheduled Distribution Date | S-73 |
| Additional Issuances of Certificates | S-73 |
| THE POLICY | S-74 |
| The Policy | S-74 |
| THE INSURER | S-76 |
| General | S-76 |
| Reinsurance | S-76 |
| Ratings | S-77 |
| Capitalization | S-77 |
| Incorporation of Certain Documents by Reference | S-78 |

Originators...................... Credit Suisse Financial Corporation, referred to in this prospectus supplement as CSFC and DLJ Mortgage Capital. Countrywide Home Loans, Inc., referred to in this prospectus supplement as Countrywide Home Loans. No other originator has originated or acquired more than 10% of the mortgage loans (by aggregate cut-off date principal balance).

Servicers........................ Select Portfolio Servicing, Inc., referred to in this prospectus supplement as SPS, Wells Fargo Bank, N.A., referred to in this prospectus supplement as Wells Fargo Bank and Countrywide Home Loans Servicing LP, referred to in this prospectus supplement as Countrywide Servicing. No other servicer will service more than 10% of the mortgage loans (by aggregate cut-off date principal balance).

Master Servicer.................. Wells Fargo Bank, also referred to in this prospectus supplement as the master servicer. The master servicer will oversee and enforce the servicing of the mortgage loans by the servicers, other than Washington Mutual Mortgage Securities Corp., referred to in this prospectus supplement as WMMSC. The master servicer will have no obligations to oversee and enforce the servicing of the mortgage loans by WMMSC.

Trustee.......................... U.S. Bank National Association, referred in this prospectus supplement as U.S. Bank.

Trust Administrator.............. Wells Fargo Bank.

Counterparty under the interest rate cap agreements.............. Credit Suisse International,  referred to in this prospectus supplement as CSi or the cap counterparty.

Class A-3-A and Class A-4 Certificate Insurer.............. Financial Security Assurance Inc.

Mortgage pool.................... 3,773 fixed-rate mortgage loans with an aggregate principal balance of approximately $1,003,954,034.46 as of the cut-off date, secured by first liens on one- to four-family residential properties.

Cut-off date..................... September 1, 2006

Closing date..................... On or about September 29, 2006.

Distribution dates............... The 25th  day of each month,  or if the 25th day is not a business day, on the succeeding business day beginning in October 2006.

Form of offered certificates...... The offered certificates, other than the Class AR Certificates, will be book-entry certificates. The Class AR Certificates will be physical certificates. See "Description of the Certificates--Book-Entry Registration" in this prospectus supplement.

-----------------------------------------------------------------------

S-5

<PAGE>

-------------------------------------------------------------------------------

SUMMARY INFORMATION

This summary highlights selected information from this prospectus supplement and does not contain all of the information necessary to make your investment decision. Please read this entire prospectus supplement and the accompanying prospectus carefully for additional information about the offered certificates.

Mortgage-Backed Pass-Through Certificates, Series 2006-2

<TABLE>
<CAPTION>

| Class | Initial Class Principal Balance | Per Annum Pass-Through Rate | Initial Certificate Ratings | | Designation |
|-------|---------|---------|---------|---------|---------|
| | | | Moody's Rating | S&P Rating | |
| ----- | ------------------------- | -------------------- | --------------- | ------------ | ----------- |
| <S> | <C> | <C> | <C> | <C> | <C> |

Offered Certificates

Senior Certificates

```
<S>                                                      <C>        <C>                  <C>
  30 - 59 Days.........................................  306        $    78,960,013.32    7.86%
  60 - 89 Days.........................................   64             15,839,089.81    1.58
  90 - 120 Days........................................    5              1,106,207.51    0.11
  Never Delinquent.....................................  3,398          908,048,723.82   90.45
                                                        -----        ------------------  ------
  Total:..............................................  3,773        $1,003,954,034.46  100.00%
                                                        =====        ==================  ======
```

</TABLE>

-----------------
*    As of the cut-off date, no loan has been 120 days or more delinquent in
     the past 12 months.

                                   S-27
<PAGE>

Additional Information

     A current report on Form 8-K will be available to purchasers of the
offered certificates and will be filed, together with the pooling and servicing
agreement, with the Securities and Exchange Commission after the initial
issuance of the offered certificates.

     The credit score tables included among the foregoing tables show the
credit scores, if any, that the originators or underwriters of the mortgage
loans collected for some mortgagors. Third-party credit reporting organizations
provide credit scores as an aid to lenders in evaluating the creditworthiness of
borrowers. Although different credit reporting organizations use different
methodologies, higher credit scores generally indicate greater creditworthiness.
However, credit scores do not necessarily correspond to the probability of
default over the life of the related mortgage loan because they reflect past
credit history, rather than an assessment of future payment performance. In
addition, the credit scores shown were collected from a variety of sources over
a period of weeks or months, and the credit scores do not necessarily reflect
the credit scores that would be reported as of the date of this prospectus
supplement. Credit scores also only indicate general consumer creditworthiness,
and credit scores are not intended to specifically apply to mortgage debt.
Therefore, credit scores should not be considered as an accurate predictor of
the likelihood of repayment of the related mortgage loans.

                              THE ORIGINATORS

General

     As of the Cut-off Date, DLJ Mortgage Capital acquired 50.96% of the
mortgage loans, CSFC originated or acquired 10.15% of the mortgage loans and
Countrywide Home Loans Inc. originated or acquired 11.40% of the mortgage loans
(in each case by Cut-off Date Principal Balance). No other originator originated
or acquired more than 10% of the mortgage loans (by Cut-off Date Principal
Balance). The underwriting standards described below are applicable to the
origination of all of the mortgage loans.

Underwriting Standards

     The mortgage loans have been purchased by the seller from various banks,
savings and loan associations, mortgage bankers (which may or may not be
affiliated with the seller) and other mortgage loan originators and purchasers
of mortgage loans in the secondary market. The mortgage loans were originated
generally in accordance with the underwriting criteria described herein.

     The underwriting standards applicable to the mortgage loans typically
differ from, and are, with respect to a substantial number of mortgage loans,
generally less stringent than, the underwriting standards established by Fannie
Mae or Freddie Mac primarily with respect to original principal balances,
loan-to-value ratios, borrower income, required documentation, interest rates,
borrower occupancy of the mortgaged property and/or property types. To the
extent the programs reflect underwriting standards different from those of
Fannie Mae and Freddie Mac, the performance of the mortgage loans thereunder may
reflect higher delinquency rates and/or credit losses. In addition, certain
exceptions to the underwriting standards described herein are made in the event
that compensating factors are demonstrated by a prospective borrower. Neither
the depositor nor any affiliate, including DLJ Mortgage Capital, has
re-underwritten any mortgage loan.

     Generally, each mortgagor will have been required to complete an
application designed to provide to the original lender pertinent credit
information concerning the mortgagor. As part of the description of the
mortgagor's financial condition, the mortgagor will have furnished information
with respect to its assets, liabilities, income (except as described below),
credit history, employment history and personal information, and furnished an
authorization to apply for a credit report which summarizes the mortgagor's
credit history with local merchants and lenders and any record of bankruptcy.
The mortgagor may also have been required to authorize verifications of deposits
at financial institutions where the mortgagor had demand or savings accounts. In
the case of investment properties and two- to four-unit dwellings, income
derived from the mortgaged property may have been considered for underwriting
purposes, in addition to the income of the mortgagor from other sources. With
respect to mortgaged property consisting of vacation or second homes, no income
derived from the property generally will have been

<PAGE>

considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

The mortgage loans have been originated under "full" or "alternative," "reduced documentation," "stated income/stated assets" or "no income/no asset" programs. The "alternative," "reduced," "stated income/stated assets" and "no income/no asset" programs generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. Generally, an "alternative" documentation program requires information regarding the mortgagor's income (i.e., W-2 forms, tax returns and/or pay stubs) and assets (i.e., bank statements) as does a "full doc" loan, however, alternative forms of standard verifications are used. Generally, under both "full" and "alternative" documentation programs at least one year of income documentation is provided. Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator. Reduced doc loans may also include loans having only one year of income verification and loans to mortgagors with acceptable payment histories and credit scores but no information or verification of the mortgagor's income. Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator. The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

DLJ Mortgage Capital, Inc.

As of the Cut-off Date, DLJMC acquired approximately 50.96% of the mortgage loans (by Cut-off Date Principal Balance) through its whole-loan flow acquisition channel from originators that DLJMC has determined met its qualified correspondent requirements. Such standards require that the following conditions be satisfied: (i) the related mortgage loans were originated pursuant to a mortgage loan purchase agreement between DLJMC and the applicable qualified correspondent that contemplated that such qualified correspondent would underwrite mortgage loans from time to time, for sale to DLJMC, in accordance with underwriting guidelines designated by DLJMC ("Designated Guidelines") or guidelines that do not vary materially from such Designated Guidelines; (ii)

<PAGE>

such mortgage loans were in fact underwritten as described in clause (i) above and were acquired by DLJMC within 270 days after the related origination dates; (iii) the Designated Guidelines were, at the time such mortgage loans were underwritten, designated by DLJMC on a consistent basis for use by originators in originating mortgage loans to be purchased by DLJMC; and (iv) DLJMC employed, at the time such mortgage loans were acquired by DLJMC, certain quality assurance procedures designed to ensure that the applicable qualified correspondent from which it purchased the related mortgage loans properly

applied the underwriting criteria designated by DLJMC. DLJMC purchased
approximately $10.0 billion, $9.8 billion and $9.9 billion of mortgage loans
through its whole-loan flow acquisition channel during 2003, 2004 and 2005,
respectively, and approximately $4.2 billion of mortgage loans through its
whole-loan flow acquisition channel through June 30, 2006.

Credit Suisse Financial Corporation

    Credit Suisse Financial Corporation ("CSFC"), an affiliate of the sponsor
and an originator, is a Delaware corporation. CSFC conducts lending through
wholesale loan production offices. CSFC operates more than 2 wholesale loan
production offices located in 3 states and makes loans throughout all 50 states
and the District of Columbia. CSFC has been originating mortgage loans since
2003. The principal executive offices of CSFC are located at 302 Carnegie
Center, 2nd Floor, Princeton, New Jersey 08540. CSFC originated approximately
$0.9 million, $485.6 million and $2.7 million of mortgage loans during 2003,
2004 and 2005, respectively, and approximately $1.5 billion through June 30,
2006.

                        STATIC POOL INFORMATION

    The depositor will make available any of the sponsor's material static
pool information as required under the SEC's rules and regulations on a website
on the world wide web. The static pool information material to this offering of
certificates is located in the hyperlinks labeled CSAB 2006-2 Original Portfolio
Summary Characteristics and CSAB 2006-2 Performance data at
http://www.credit-suisse.csmc.static-pool.com. Access to this web address is
unrestricted and free of charge. The static pool information includes (i)
information about the original characteristics of each prior securitized pool as
of the cut-off date for that pool and (ii) delinquency, loss and prepayment
information about each prior securitized pool.

    The static pool information is not deemed to be a part of this prospectus
or the registration statement of which this prospectus is a part to the extent
that the static pool information relates to (a) any trust fund that was
established before January 1, 2006 and (b) information relating to assets of any
trust fund established on or after January 1, 2006, which information relates to
periods prior to January 1, 2006.

    There can be no assurances that the rates of delinquencies, losses and
prepayments experienced by the prior securitized pools will be comparable to
delinquencies, losses and prepayments expected to be experienced by the mortgage
loans owned by the trust.

                  AFFILIATES AND RELATED TRANSACTIONS

    The sponsor, the depositor, CSFC and the underwriter are affiliated
entities and wholly owned subsidiaries of Credit Suisse Holdings (USA), Inc. CSi
is an affiliate of Credit Suisse Holding (USA), Inc. In addition, on October 4,
2005, Credit Suisse (USA), Inc., an affiliate of the sponsor, acquired all of
the outstanding stock of SPS's parent from the prior shareholders. There is not
currently and there was not during the past two years any material business
relationship, arrangement or other understanding between any of the sponsor, the
depositor, the cap counterparty, the underwriter or SPS that was entered into
outside the ordinary course of business of each such party or on terms other
than would be obtained in an arm's length transaction with unaffiliated
entities.

                               S-30
<PAGE>

                     THE SPONSOR AND THE SELLER

    DLJ Mortgage Capital, Inc., a Delaware corporation ("DLJMC"), is referred
to in this prospectus supplement as the "sponsor," a "seller" and an
"originator." Its executive offices are located at 11 Madison Avenue, New York,
NY 10010. The sponsor is an affiliate of the depositor, the underwriter, the cap
counterparty and SPS.

    The sponsor, together with its affiliates, is involved in mortgage-backed
securitizations and other structured financing arrangements. The sponsor has
been engaged in the securitization of assets since its inception in 1988. In
connection with these activities, the sponsor uses special purpose entities,
such as the depositor, primarily for (but not limited to) the securitization of
residential mortgages and home equity loans.

    From the period beginning January 1, 2006 and ending June 30, 2006, the
sponsor publicly securitized through the depositor in excess of approximately
$16 billion of residential mortgages.

    In the normal course of its securitization program, the sponsor acquires
mortgage loans from third party originators and through its affiliates. The
sponsor or its affiliates structure securitization transactions in which the
mortgage loans are sold to the depositor and the depositor issues the securities
supported by the cash flows generated by the mortgage loans and secured by the
mortgage loans. The sponsor will make certain representations and warranties to
the depositor and the trustee regarding the mortgage loans and if such
representations and warranties are breached, the sponsor may have an obligation
to repurchase or substitute such mortgage loans from the depositor (or directly
from the trustee). To mitigate these risks, however, to the extent the mortgage
loans being securitized have been originated by third parties, the sponsor will
generally obtain appropriate representations and warranties from these third
parties upon the acquisition of such mortgage loans.

# EXHIBIT 2

## AFFIDAVIT OF SARAH E. MADSEN IN SUPPORT OF PLAINTIFF'S MOTION TO REMAND OR ABSTAIN

*Minnesota Life Insurance Company, et al.*
*v.*
*Credit Suisse First Boston Mortgage Securities Corp., et al.*

**Court File No. 12-cv-02671 (ADM/LIB)**

Prospectus Supplement (To Prospectus Dated October 27, 2006)

# CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.
Depositor

# DLJ MORTGAGE CAPITAL, INC.
Sponsor and Seller

# WELLS FARGO BANK, N.A.
Master Servicer

# CSAB MORTGAGE-BACKED TRUST 2006-3
Issuing Entity

# CSAB MORTGAGE-BACKED PASS-THROUGH CERTIFICATES, SERIES 2006-3

## $805,757,100
(Approximate)

| | |
|---|---|
| You should carefully review the information in "Risk Factors" on page S-14 in this prospectus supplement and on page 5 in the prospectus.<br><br>This prospectus supplement may be used to offer and sell the certificates only if accompanied by the prospectus. | **The trust will issue:**<br><br>• Fourteen classes of senior certificates, including one class of residual certificates.<br><br>• Eight classes of subordinate certificates, which provide credit enhancement for the senior certificates and each class of subordinate certificates, if any, with a higher payment priority.<br><br>• Two other classes of non-offered certificates. |

**The certificates:**

- Represent ownership interests in a trust, whose assets are primarily a pool of fixed-rate, first lien residential mortgage loans that were generally originated in accordance with underwriting guidelines that are not as strict as Fannie Mae and Freddie Mac guidelines.

- Represent obligations of the trust only and do not represent an interest in or obligation of the depositor, the servicers, any special servicer, the master servicer, the trust administrator, the sponsor, the seller, the trustee or any of their affiliates or any other entity. Except for the financial guaranty insurance policy issued by Financial Security Assurance Inc. for the benefit of the Class A-4-A, Class A-5-A and Class A-6 Certificates, no governmental agency or instrumentality or any other person will insure the certificates or the mortgage loans.

- Offered to the public and their class principal balances and interest rates are listed under the heading "Offered Certificates" in the table on page S-6.

**Risks:**

- The yield to investors on each class of certificates will be sensitive to the rate and timing of principal payments on the mortgage loans which may vary over time.

- Net interest shortfalls from prepayments on mortgage loans and losses from liquidations of defaulted mortgage loans will adversely affect the yield to investors in the certificates, and the investors in the subordinate certificates in particular.

Principal and interest on the certificates entitled to receive such amounts will be payable monthly, beginning on the distribution date in November 2006, as described in this prospectus supplement. Credit enhancement for all of the classes of offered certificates will be provided by overcollateralization, the use of excess interest to create or maintain overcollateralization and subordination. The Class A-4-A, Class A-5-A and Class A-6 Certificates will have the benefit of a financial guaranty insurance policy issued by Financial Security Assurance Inc.

Credit Suisse Securities (USA) LLC, as underwriter, will buy the offered certificates from Credit Suisse First Boston Mortgage Securities Corp., the depositor, at a price equal to approximately 99.95% of their face value plus accrued interest. The depositor will pay the expenses related to the issuance of the certificates from these proceeds. The underwriter will sell the offered certificates it purchases from time to time in negotiated transactions at varying prices determined at the time of sale.

The trust will make multiple REMIC elections for federal income tax purposes.

Neither the SEC nor any state securities commission has approved or disapproved these securities or determined if this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

Delivery of the offered certificates, other than the Class AR Certificates, will be made in book-entry form through the facilities of The Depository Trust Company, Clearstream, Luxembourg and the Euroclear System on or after October 30, 2006.

## Credit Suisse
October 27, 2006

## SUMMARY

The following summary highlights selected information from this prospectus supplement. It does not contain all of the information that you should consider in making your investment decision. To understand the terms of the offered certificates, read this entire prospectus supplement and the entire accompanying prospectus carefully.

| | |
|---|---|
| Title of series | CSAB Mortgage-Backed Pass-Through Certificates, Series 2006-3. |
| Sponsor | DLJ Mortgage Capital, Inc., referred to in this prospectus supplement as DLJ Mortgage Capital or DLJMC. |
| Depositor | Credit Suisse First Boston Mortgage Securities Corp. |
| Issuing Entity | CSAB Mortgage-Backed Trust 2006-3, a common law trust formed under the laws of the state of New York, referred to in this prospectus supplement as the trust. |
| Seller | DLJ Mortgage Capital, also referred to in this prospectus supplement as the seller. The seller will make the representations and warranties with respect to the mortgage loans to the trust. |
| Originators | Credit Suisse Financial Corporation, referred to in this prospectus supplement as CSFC and DLJ Mortgage Capital. No other originator has originated or acquired more than 10% of the mortgage loans (by aggregate cut-off date principal balance). |
| Servicers | Select Portfolio Servicing, Inc., referred to in this prospectus supplement as SPS and Wells Fargo Bank, N.A., referred to in this prospectus supplement as Wells Fargo Bank. No other servicer will service more than 10% of the mortgage loans (by aggregate cut-off date principal balance). |
| Master Servicer | Wells Fargo Bank, also referred to in this prospectus supplement as the master servicer. The master servicer will oversee and enforce the servicing of the mortgage loans by the servicers. |
| Trustee | U.S. Bank National Association, referred in this prospectus supplement as U.S. Bank. |
| Trust Administrator | Wells Fargo Bank. |
| Counterparty under the interest rate cap agreements | Credit Suisse International, referred to in this prospectus supplement as CSi or the cap counterparty. |
| Class A-4-A, Class A-5-A and Class A-6 Certificate Insurer | Financial Security Assurance Inc. |
| Mortgage pool | 3,183 fixed-rate mortgage loans with an aggregate principal balance of approximately $805,757,561 as of the cut-off date, secured by first liens on one- to four-family residential properties. |
| Cut-off date | October 1, 2006 |
| Closing date | On or about October 30, 2006. |
| Distribution dates | The 25th day of each month, or if the 25th day is not a business day, on the succeeding business day beginning in November 2006. |
| Form of offered certificates | The offered certificates, other than the Class AR Certificates, will be book-entry certificates. The Class AR Certificates will be physical certificates. See "Description of the Certificates—Book-Entry Registration" in this prospectus supplement. |

**Additional Information**

A current report on Form 8-K will be available to purchasers of the offered certificates and will be filed, together with the pooling and servicing agreement, with the Securities and Exchange Commission after the initial issuance of the offered certificates.

The credit score tables included among the foregoing tables show the credit scores, if any, that the originators or underwriters of the mortgage loans collected for some mortgagors. Third-party credit reporting organizations provide credit scores as an aid to lenders in evaluating the creditworthiness of borrowers. Although different credit reporting organizations use different methodologies, higher credit scores generally indicate greater creditworthiness. However, credit scores do not necessarily correspond to the probability of default over the life of the related mortgage loan because they reflect past credit history, rather than an assessment of future payment performance. In addition, the credit scores shown were collected from a variety of sources over a period of weeks or months, and the credit scores do not necessarily reflect the credit scores that would be reported as of the date of this prospectus supplement. Credit scores also only indicate general consumer creditworthiness, and credit scores are not intended to specifically apply to mortgage debt. Therefore, credit scores should not be considered as an accurate predictor of the likelihood of repayment of the related mortgage loans.

## THE ORIGINATORS

**General**

As of the Cut-off Date, DLJ Mortgage Capital acquired 49.23% of the mortgage loans and CSFC originated or acquired 18.93% of the mortgage loans (in each case by Cut-off Date Principal Balance). No other originator originated or acquired more than 10% of the mortgage loans (by Cut-off Date Principal Balance). The underwriting standards described below are applicable to the origination of all of the mortgage loans.

*Underwriting Standards*

The mortgage loans have been purchased by the seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with the seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market. The mortgage loans were originated generally in accordance with the underwriting criteria described herein.

The underwriting standards applicable to the mortgage loans typically differ from, and are, with respect to a substantial number of mortgage loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower. Neither the depositor nor any affiliate, including DLJ Mortgage Capital, has re-underwritten any mortgage loan.

Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to mortgaged property consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

The mortgage loans have been originated under "full" or "alternative," "reduced documentation," "stated income/stated assets" or "no income/no asset" programs. The "alternative," "reduced," "stated income/stated assets" and "no income/no asset" programs generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. Generally, an "alternative" documentation program requires information regarding the mortgagor's income (i.e., W-2 forms, tax returns and/or pay stubs) and assets (i.e., bank statements) as does a "full doc" loan, however, alternative forms of standard verifications are used. Generally, under both "full" and "alternative" documentation programs at least one year of income documentation is provided. Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator. Reduced doc loans may also include loans having only one year of income verification and loans to mortgagors with acceptable payment histories and credit scores but no information or verification of the mortgagor's income. Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator. The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

### DLJ Mortgage Capital, Inc.

As of the Cut-off Date, DLJMC acquired approximately 49.23% of the mortgage loans (by Cut-off Date Principal Balance) through its whole-loan flow acquisition channel from originators that DLJMC has determined met its qualified correspondent requirements. Such standards require that the following conditions be satisfied: (i) the related mortgage loans were originated pursuant to a mortgage loan purchase agreement between DLJMC and the applicable qualified correspondent that contemplated that such qualified correspondent would underwrite mortgage loans from time to time, for sale to DLJMC, in accordance with underwriting guidelines designated by DLJMC ("Designated Guidelines") or guidelines that do not vary materially from such Designated Guidelines; (ii) such mortgage loans were in fact underwritten as described in clause (i) above and were acquired by DLJMC within 270 days after the related origination dates; (iii) the Designated Guidelines were, at the time such mortgage loans were underwritten, designated by DLJMC on a consistent basis for use by originators in originating mortgage loans

S-30

to be purchased by DLJMC; and (iv) DLJMC employed, at the time such mortgage loans were acquired by DLJMC, certain quality assurance procedures designed to ensure that the applicable qualified correspondent from which it purchased the related mortgage loans properly applied the underwriting criteria designated by DLJMC. DLJMC purchased approximately $10.0 billion, $9.8 billion and $9.9 billion of mortgage loans through its whole-loan flow acquisition channel during 2003, 2004 and 2005, respectively, and approximately $6.0 billion of mortgage loans through its whole-loan flow acquisition channel through September 30, 2006. The Designated Guidelines are substantially similar to the guidelines described above under "—General—Underwriting Standards".

### Credit Suisse Financial Corporation

Credit Suisse Financial Corporation ("CSFC"), an affiliate of the sponsor and an originator, is a Delaware corporation. CSFC conducts lending through wholesale loan production offices. CSFC operates more than 2 wholesale loan production offices located in 3 states and makes loans throughout all 50 states and the District of Columbia. CSFC has been originating mortgage loans since 2003. The principal executive offices of CSFC are located at 302 Carnegie Center, 2nd Floor, Princeton, New Jersey 08540. CSFC originated approximately $0.9 million, $485.6 million and $2.7 billion of mortgage loans during 2003, 2004 and 2005, respectively, and approximately $2.3 billion through September 30, 2006.

## STATIC POOL INFORMATION

The depositor will make available any of the sponsor's material static pool information as required under the SEC's rules and regulations on a website on the world wide web. The static pool information material to this offering of certificates is located in the hyperlinks labeled CSAB 2006-3 Original Portfolio Summary Characteristics and CSAB 2006-3 Performance data at http://www.credit-suisse.csab.static-pool.com. Access to this web address is unrestricted and free of charge. The static pool information includes (i) information about the original characteristics of each prior securitized pool as of the cut-off date for that pool and (ii) delinquency, loss and prepayment information about each prior securitized pool.

The static pool information is not deemed to be a part of this prospectus or the registration statement of which this prospectus is a part to the extent that the static pool information relates to (a) any trust fund that was established before January 1, 2006 and (b) information relating to assets of any trust fund established on or after January 1, 2006, which information relates to periods prior to January 1, 2006.

There can be no assurances that the rates of delinquencies, losses and prepayments experienced by the prior securitized pools will be comparable to delinquencies, losses and prepayments expected to be experienced by the mortgage loans owned by the trust.

## AFFILIATES AND RELATED TRANSACTIONS

The sponsor, the depositor, CSFC and the underwriter are affiliated entities and wholly owned subsidiaries of Credit Suisse Holdings (USA), Inc. CSi is an affiliate of Credit Suisse Holding (USA), Inc. In addition, on October 4, 2005, Credit Suisse (USA), Inc., an affiliate of the sponsor, acquired all of the outstanding stock of SPS's parent from the prior shareholders. There is not currently and there was not during the past two years any material business relationship, arrangement or other understanding between any of the sponsor, the depositor, CSFC, CSi, the underwriter or SPS that was entered into outside the ordinary course of business of each such party or on terms other than would be obtained in an arm's length transaction with unaffiliated entities.

# EXHIBIT 3

## AFFIDAVIT OF SARAH E. MADSEN
## IN SUPPORT OF PLAINTIFF'S MOTION
## TO REMAND OR ABSTAIN

*Minnesota Life Insurance Company, et al.*

*v.*

*Credit Suisse First Boston Mortgage Securities Corp., et al.*

**Court File No. 12-cv-02671 (ADM/LIB)**

*Prospectus Supplement (to Prospectus dated April 20, 2007)*

# $592,580,000
## (Approximate)
## DLJ Mortgage Capital, Inc.
*Sponsor and a Seller*

## Credit Suisse First Boston Mortgage Securities Corp.
*Depositor*

## Wells Fargo Bank, N.A.
*Master Servicer and Trust Administrator*

## CSMC Mortgage-Backed Trust 2007-4
*Issuing Entity*

## CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-4

---

*You should consider carefully the risk factors beginning on page S-17 in this prospectus supplement and page 5 of the accompanying prospectus.*

*The certificates will represent ownership interests only in the CSMC Mortgage-Backed Trust 2007-4 and will not represent ownership interests in or obligations of the sponsor, the seller, the servicers, the special servicer, the modification oversight agent the master servicer, the trust administrator, the trustee, the depositor or any of their affiliates.*

*This prospectus supplement may be used to offer and sell the certificates offered hereby only if accompanied by the prospectus.*

---

### Offered Certificates

*Thirty-nine classes of the Series 2007-4 Certificates are being offered hereby. You can find a list of the offered certificates together with their designations, initial class principal balances or initial notional amounts, initial pass-through rates and certain other characteristics on pages S-7 through S-10 of this prospectus supplement. Principal and interest, as applicable, on the offered certificates will be paid monthly. The first expected distribution date is June 25, 2007.*

*The trust will consist primarily of two pools of one-to-four family residential fixed rate, first lien mortgage loans.*

### Credit Enhancement

*The Group C-B Certificates are subordinate to and provide credit enhancement for the Group 1, Group 2, Group 3, Group 4, Group 5, A-X and Class C-X Certificates. In addition, each class of Group C-B Certificates is subordinate to and provides credit enhancement for each class of Group C-B Certificates with a lower alphanumerical designation to the extent described in this prospectus supplement.*

*Credit Suisse Securities (USA) LLC, as underwriter, will buy the offered certificates from Credit Suisse First Boston Mortgage Securities Corp., the depositor, at a price equal to approximately 99.75% of their face value, plus accrued interest, as applicable. The depositor will pay the expenses related to the issuance of the certificates from these proceeds. The underwriter will sell the offered certificates purchased by it from time to time in negotiated transactions at varying prices determined at the time of sale.*

*The CSMC Mortgage-Backed Trust 2007-4 will make multiple REMIC elections for federal income tax purposes.*

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the offered certificates or determined that this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

*Delivery of the offered certificates, other than the Class AR and Class AR-L Certificates, will be made in book-entry form through the facilities of The Depository Trust Company, Clearstream, Luxembourg and the Euroclear System on or about May 30, 2007.*

### Credit Suisse
*Underwriter*

*May 30, 2007*

## SUMMARY

The following summary highlights selected information from this prospectus supplement. It does not contain all of the information that you should consider in making your investment decision. To understand the terms of the offered certificates, read this entire prospectus supplement and the entire accompanying prospectus carefully.

| | |
|---|---|
| Title of series | CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-4. |
| Sponsor | DLJ Mortgage Capital, Inc., referred to in this prospectus supplement as DLJ Mortgage Capital. |
| Depositor | Credit Suisse First Boston Mortgage Securities Corp. |
| Issuing Entity | CSMC Mortgage-Backed Trust 2007-4, a common law trust formed under the laws of the state of New York, referred to in this prospectus supplement as the trust. |
| Seller | DLJ Mortgage Capital.  The seller will make the representations and warranties with respect to the mortgage loans to the trust. |
| Originators | IndyMac Bank, F.S.B., referred to in this prospectus supplement as IndyMac, and Wells Fargo Bank, N.A., referred to in this prospectus supplement as Wells Fargo Bank.  No other originator has originated or acquired more than 10% of the mortgage loans (by aggregate cut-off date principal balance). |
| Servicers | IndyMac Bank, Select Portfolio Servicing, Inc., referred to in this prospectus supplement as SPS, Universal Master Servicing LLC, referred to in this prospectus supplement as UMS and Wells Fargo Bank.  UMS has engaged subservicers for all of its servicing obligations under the pooling and servicing agreement.  No other servicer is servicing more than 10% of the mortgage loans (by aggregate cut-off date principal balance). |
| Master Servicer | Wells Fargo Bank, also referred to in this prospectus supplement as the master servicer.  The master servicer will oversee and enforce the servicing of the mortgage loans by the servicers. |
| Special Servicer and Modification Oversight Agent | SPS. |
| Custodians | Wells Fargo Bank and LaSalle Bank, National Association.  Each of the Custodians will maintain custody of certain mortgage files relating to the mortgage loans on behalf of the trust. |
| Trustee | U.S. Bank National Association, referred in this prospectus supplement as U.S. Bank or the trustee. |
| Trust Administrator | Wells Fargo Bank also referred to in this prospectus supplement as the trust administrator. |
| Mortgage pool | Pool 1 with 841 fixed rate mortgage loans with an aggregate principal balance of approximately $509,558,149.25, referred to herein as the pool 1 mortgage loans and pool 2 with 174 fixed rate mortgage loans with an aggregate principal balance of approximately $86,599,339.78, referred to herein as the pool 2 mortgage loans, each as of the cut-off date, secured by first liens on one- to four-family residential properties.  The pool 1 and pool 2 mortgage loans are also collectively referred to herein as the mortgage pool. |

To the extent principal is received or losses with respect to principal are incurred with respect to a mortgage loan that is divided into Mortgage Components, such principal or losses will be allocated among the Mortgage Components, pro rata, based on the principal balances of the Mortgage Components.

For more information regarding the characteristics of the mortgage loans in each loan group, please refer to Annex II to this prospectus supplement.

**Additional Information**

The description in this prospectus supplement of the mortgage pool and the mortgaged properties is based upon the mortgage pool as expected to be constituted at the close of business on the cut-off date, as adjusted for the scheduled principal payments due on or before the cut-off date. Prior to the issuance of the offered certificates, mortgage loans may be removed from the mortgage pool as a result of incomplete documentation or otherwise, if the depositor deems that removal necessary or appropriate. A limited number of other mortgage loans may be added to the mortgage pool prior to the issuance of the offered certificates. The depositor believes that the information in this prospectus supplement will be substantially representative of the characteristics of the mortgage pool as it will be constituted at the time the offered certificates are issued although the range of mortgage rates and maturities and some other characteristics of the mortgage loans in the mortgage pool may vary.

The credit score tables included among the foregoing tables show the credit scores, if any, that the originators or underwriters of the mortgage loans collected for some mortgagors. Third-party credit reporting organizations provide credit scores as an aid to lenders in evaluating the creditworthiness of borrowers. Although different credit reporting organizations use different methodologies, higher credit scores generally indicate greater creditworthiness. However, credit scores do not necessarily correspond to the probability of default over the life of the related mortgage loan because they reflect past credit history, rather than an assessment of future payment performance. In addition, the credit scores shown were collected from a variety of sources over a period of weeks or months, and the credit scores do not necessarily reflect the credit scores that would be reported as of the date of this prospectus supplement. Credit scores also only indicate general consumer creditworthiness, and credit scores are not intended to specifically apply to mortgage debt. Therefore, credit scores should not be considered as an accurate predictor of the likelihood of repayment of the related mortgage loans.

A current report on Form 8-K will be available to purchasers of the offered certificates and will be filed, together with the pooling and servicing agreement, with the Securities and Exchange Commission after the initial issuance of the offered certificates.

## ORIGINATORS

**General**

As of the Cut-off Date, IndyMac Bank originated or acquired 50.79% and Wells Fargo originated or acquired 11.18% of the mortgage loans. No other originator originated or acquired more than 10% of the mortgage loans in the mortgage group (by Cut-off Date Principal Balance).

*Underwriting Standards*

The mortgage loans have been purchased by a seller from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with the seller) and other mortgage loan originators and purchasers of mortgage loans in the secondary market. The mortgage loans originated or acquired by IndyMac Bank were generally originated in accordance with the underwriting criteria set forth herein under "—IndyMac Bank, F.S.B." The other mortgage loans and were originated generally in accordance with the underwriting criteria described herein.

The underwriting standards applicable to the mortgage loans typically differ from, and are, with respect to a substantial number of mortgage loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property

types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower. Neither the depositor nor any affiliate, including DLJ Mortgage Capital, has re-underwritten any mortgage loan.

Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to mortgaged property consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

The mortgage loans have been originated under "full" or "alternative," "reduced documentation," "stated income/stated assets" or "no income/no asset" programs. The "alternative," "reduced," "stated income/stated assets" and "no income/no asset" programs generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. Generally, an "alternative" documentation program requires information regarding the mortgagor's income (i.e., W-2 forms, tax returns and/or pay stubs) and assets (i.e., bank statements) as does a "full doc" loan, however, alternative forms of standard verifications are used. Generally, under both "full" and "alternative" documentation programs at least one year of income documentation is provided. Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator. Reduced doc loans may also include loans having only one year of income verification and loans to mortgagors with acceptable payment histories and credit scores but no information or verification of the mortgagor's income. Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator. The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an

agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

**IndyMac Bank, F.S.B.**

The principal executive offices of IndyMac Bank, F.S.B. ("IndyMac Bank") are located at 888 East Walnut Street, Pasadena, California 91101-7211, Pasadena, California 91101. IndyMac Bank is a federal savings bank and a wholly-owned subsidiary of IndyMac Intermediate Holdings, Inc., which is a wholly-owned subsidiary of IndyMac Bancorp, Inc. The business now operated by IndyMac Bank began in 1993 and became a federal savings bank in 2000. During calendar years 2003, 2004, 2005 and 2006, IndyMac Bank's conventional mortgage loan production was approximately, $29.2 billion, $37.9 billion, $60.8 billion and $89.95 billion, respectively.

*Origination Process*

IndyMac Bank acquires mortgage loans principally through four channels: mortgage professionals, consumer direct, correspondent and conduit. IndyMac Bank also acquires a relatively small number of mortgage loans through other channels.

*Mortgage professionals*: Mortgage brokers, mortgage bankers, financial institutions and homebuilders who have taken applications from prospective borrowers and submitted those applications to IndyMac Bank.

*Consumer direct*: Mortgage loans initiated through direct contact with the borrower. This contact may arise from internet advertising and IndyMac Bank website traffic, affinity relationships, company referral programs, realtors and through its Southern California retail banking branches.

*Correspondent*: Mortgage brokers, mortgage bankers, financial institutions and homebuilders who sell previously funded mortgage loans to IndyMac Bank.

*Conduit*: IndyMac Bank acquires pools of mortgage loans in negotiated transactions either with the original mortgagee or an intermediate owner of the mortgage loans.

IndyMac Bank approves each mortgage loan seller prior to the initial transaction on the basis of such seller's financial and management strength, reputation and prior experience. Each mortgage loan seller is periodically reviewed and if their performance, as measured by compliance with the applicable loan sale agreement, is unsatisfactory, IndyMac Bank will cease doing business with them.

*MORTGAGE LOAN UNDERWRITING STANDARDS*

*IndyMac Bank's Underwriting Process*

Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions. Conventional mortgage loans are loans that are not insured by the FHA or partially guaranteed by the VA. Conforming mortgage loans are loans that qualify for sale to Fannie Mae and Freddie Mac, whereas non-conforming mortgage loans are loans that do not so qualify. Non-conforming mortgage loans originated or purchased by IndyMac Bank pursuant to its underwriting programs typically differ from conforming loans primarily with respect to loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent that these programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of loans made pursuant to these different underwriting standards may reflect higher delinquency rates and/or credit losses.

IndyMac Bank has two principal underwriting methods designed to be responsive to the needs of its mortgage loan customers: traditional underwriting and e-MITS (Electronic Mortgage Information and Transaction System) underwriting. E-MITS is an automated, internet-based underwriting and risk-based pricing system. IndyMac Bank believes that e-MITS generally enables it to estimate expected credit loss, interest rate risk and prepayment risk more objectively than traditional underwriting and also provides consistent underwriting decisions. IndyMac Bank has procedures to override an e-MITS decision to allow for compensating factors.

IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

In determining a borrower's FICO credit score, IndyMac Bank generally selects the middle credit score of the scores provided by each of the three major U.S. credit repositories (Equifax, TransUnion and Experian) for each borrower, and then selects the lowest of these scores. In some instances, IndyMac Bank selects the middle score of the borrower with the largest amount of qualifying income among all of the borrowers on the mortgage loan. A FICO credit score might not be available for a borrower due to insufficient credit information on file with the credit repositories. In these situations, IndyMac Bank will establish a borrower's credit history through documentation of alternative sources of credit such as utility payments, auto insurance payments and rent payments. In addition to the FICO credit score, other information regarding a borrower's credit quality is considered in the loan approval process, such as the number and degree of any late mortgage or rent payments within the preceding 12-month period, the age of any foreclosure action against any property owned by the borrower, the age of any bankruptcy action, the number of seasoned tradelines reflected on the credit report and any outstanding judgments, liens, charge-offs or collections.

For each mortgage loan with a Loan-to-Value Ratio at origination exceeding 80%, IndyMac Bank will usually require a primary mortgage guarantee insurance policy that conforms to the guidelines of Fannie Mae and Freddie Mac. After the date on which the Loan-to-Value Ratio of a mortgage loan is 80% or less, either because of principal payments on the mortgage loan or because of a new appraisal of the mortgaged property, no primary mortgage guaranty insurance policy will be required on that mortgage loan.

All of the insurers that have issued primary mortgage guaranty insurance policies with respect to the mortgage loans meet Fannie Mae's or Freddie Mac's standards or are acceptable to the Rating Agencies. In some circumstances, however, IndyMac Bank does not require primary mortgage guaranty insurance on mortgage loans with Loan-to-Value Ratios greater than 80%.

IndyMac Bank originates and purchases loans that have been originated under one of seven documentation programs: Full/Alternate, FastForward, Bank Statement, Stated Income, No Income/No Asset, No Ratio and No Doc.

Under the Full/Alternate Documentation Program, the prospective borrower's employment, income and assets are verified through written or telephonic communications. All loans may be submitted under the Full/Alternate Documentation Program. The Full/Alternate Documentation Program also provides for alternative methods of employment verification generally using W-2 forms or pay stubs. Borrowers applying under the Full/Alternate Documentation Program may, based on certain credit and loan characteristics, qualify for IndyMac Bank's FastForward program and be entitled to income and asset documentation relief. Borrowers who qualify for FastForward must state their income, provide a signed Internal Revenue Service Form 4506 (authorizing IndyMac Bank to obtain copies of their tax returns), and state their assets; IndyMac Bank does not require any verification of income or assets under this program.

The Bank Statement Documentation Program is similar to the Full/Alternate Documentation Program except that borrowers generally must document income and employment for six months (rather than two, as required by the Full/Alternate Documentation Program). Borrowers under the Bank Statement Documentation Program may use bank statements to verify their income and employment. If applicable, written verification of a borrower's assets is required under this program.

Under the Stated Income Documentation Program and the No Ratio Program, more emphasis is placed on the prospective borrower's credit score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower than on income underwriting. The Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income. Information regarding assets is verified through written communications. Information regarding income is not verified. The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications. The No Ratio Program does not require prospective borrowers to provide information regarding their income. Employment is orally verified under both programs.

Under the No Income/No Asset Documentation Program and the No Doc Documentation Program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral, rather than on the income and the assets of the prospective borrower. Prospective borrowers are not required to provide information regarding their assets or income under either program, although under the No Income/No Asset Documentation Program, employment is orally verified.

IndyMac Bank generally will re-verify income, assets, and employment for mortgage loans it acquires through the wholesale channel, but not for mortgage loans acquired through other channels.

Maximum loan-to-value and combined loan-to-value ratios and loan amounts are established according to the occupancy type, loan purpose, property type, FICO credit score, number of previous late mortgage payments, and the age of any bankruptcy or foreclosure actions. Additionally, maximum total monthly debt payments-to-income ratios and cash-out limits may be applied. Other factors may be considered in determining loan eligibility such as a borrower's residency and immigration status, whether a non-occupying borrower will be included for qualification purposes, sales or financing concessions included in any purchase contract, the acquisition cost of the property in the case of a refinance transaction, the number of properties owned by the borrower, the type and amount of any subordinate mortgage, the amount of any increase in the borrower's monthly mortgage payment compared to previous mortgage or rent payments and the amount of disposable monthly income after payment of all monthly expenses.

To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice. The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form. In some cases, an automated valuation model (AVM) may be used in lieu of an appraisal. AVMs are computer programs that use real estate information, such as demographics, property characteristics, sales prices, and price trends to calculate a value for the specific property. The value of the property, as indicated by the appraisal or AVM, must support the loan amount.

Underwriting procedures vary by channel of origination. Generally, mortgage loans originated through the mortgage professional channel will be submitted to e-MITS for assessment and subjected to a full credit review and analysis. Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-underwritten and approved under an exception to those underwriting guidelines. Mortgage loans originated through the consumer direct channel are subjected to essentially the same procedures, modified as necessary to reflect the fact that no third-party contributes to the preparation of the credit file.

IndyMac Bank currently operates two mortgage loan purchase programs as part of its correspondent channel:

1. *Prior Approval Program.* Under this program, IndyMac Bank performs a full credit review and analysis of each mortgage loan generally with the same procedures used for mortgage loans originated through the mortgage professionals channel. Only after IndyMac Bank issues an approval notice to a "third party loan originator" is a mortgage loan eligible for purchase pursuant to this program.

2. *Preferred Delegated Underwriting Program.* Under this program, third party loan originators that meet certain eligibility requirements are allowed to tender mortgage loans for purchase without the need for IndyMac Bank to verify mortgagor information. The eligibility requirements for participation in the Preferred Delegated Underwriting Program vary based on the net worth of the third party loan originators with more stringent

requirements imposed on third party loan originators with a lower net worth. Third party loan originators are required to submit a variety of information to IndyMac Bank for review, including their current audited financial statements, their quality control policies and procedures, their current errors and omissions/fidelity insurance coverage evidencing blanket coverage in a minimum amount of $300,000; at least three underwriters' resumes showing at least three years experience or a direct endorsement designation, and at least two references from mortgage insurance companies. Third party loan originators are required to have an active, traditional warehouse line of credit, which is verified together with the bailee letter and wire instructions. IndyMac Bank requires each third party loan originator to be recertified on an annual basis to ensure that it continues to meet the minimum eligibility guidelines for the Preferred Delegated Underwriting Program.

Under the Preferred Delegated Underwriting Program, each eligible third party loan originator is required to underwrite mortgage loans in compliance with IndyMac Bank's underwriting guidelines usually by use of e-MITS or, infrequently, by submission of the mortgage loan to IndyMac Bank for traditional underwriting. A greater percentage of mortgage loans purchased pursuant to this program are selected for post-purchase quality control review than for the other program.

Mortgage loans originated through the conduit channel are generally initially underwritten by a "third party seller" to the third party seller's underwriting guidelines. IndyMac Bank reviews each third party seller's guidelines for acceptability, and these guidelines generally meet industry standards and incorporate many of the same factors used by Fannie Mae, Freddie Mac and IndyMac Bank. Each mortgage loan is re-underwritten by IndyMac Bank for compliance with its guidelines based only on the objective characteristics of the mortgage loan, such as FICO credit score, documentation type, loan-to-value ratio, etc., but without reassessing the underwriting procedures originally used. In addition, a portion of the mortgage loans acquired from a third party seller are subjected to a full re-underwriting.

Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer.

**DLJ Mortgage Capital, Inc.**

As of the Cut-off Date, the sponsor acquired approximately 5.97% of the mortgage loans (by Cut-off Date Principal Balance) through its whole-loan flow acquisition channel from originators that the sponsor has determined met its qualified correspondent requirements. Such standards require that the following conditions be satisfied: (i) the related mortgage loans were originated pursuant to a mortgage loan purchase agreement between the sponsor and the applicable qualified correspondent that contemplated that such qualified correspondent would underwrite mortgage loans from time to time, for sale to the sponsor, in accordance with underwriting guidelines designated by the sponsor ("<u>Designated Guidelines</u>") or guidelines that do not vary materially from such Designated Guidelines; (ii) such mortgage loans were in fact underwritten as described in clause (i) above and were acquired by the sponsor within 270 days after the related origination dates; (iii) the Designated Guidelines were, at the time such mortgage loans were underwritten, designated by the sponsor on a consistent basis for use by originators in originating mortgage loans to be purchased by the sponsor; and (iv) the sponsor employed, at the time such mortgage loans were acquired by the sponsor, certain quality assurance procedures designed to ensure that the applicable qualified correspondent from which it purchased the related mortgage loans properly applied the underwriting criteria designated by the sponsor. The Designated Guidelines are substantially similar to the guidelines described above under "General—Underwriting Standards."

## STATIC POOL INFORMATION

The depositor will make available any of the sponsor's material static pool information as required under the SEC's rules and regulations on a website on the world wide web. The static pool information material to this offering of certificates is located in the hyperlinks labeled CSMC 2007-4 Original Portfolio Summary Characteristics and CSMC 2007-4 Performance Data at http://www.credit-suisse.csmc.static-pool.com. Access to this web address is unrestricted and free of charge. The static pool information includes (i) information about the original characteristics of each prior securitized pool as of the cut-off date for that pool and (ii) delinquency, loss and prepayment information about each prior securitized pool. For purposes of describing delinquency information about each prior securitized pool, a mortgage loan is considered to be delinquent when a payment due on any due